**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No.  18-cr-00480-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  LYLE WILLIAM PERRY,

      Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR
COMPASSIONATE RELEASE [DOC. #67]**

---

      The United States respectfully submits this response in opposition to Mr. Lyle Perry's Renewed Motion for Compassionate Release [doc. # 67].  The defendant's request is based on his concerns regarding a potential COVID-19 outbreak at his prison facility.  Because the defendant cannot demonstrate that his incarceration for five months of his thirty-six month sentence is sufficient to fulfill the sentencing factors under 18 U.S.C. § 3553(a), the Court should deny the motion.

                                **I.**        **Factual and Procedural Background**

**A.**    **The Defendant's Crime**

      On December 6, 2019, the Court sentenced the defendant to a term of imprisonment of thirty-six months followed by three years of supervised release on his plea to conspiracy to commit money laundering.  *See* Judgment [doc. #53].  As set forth in the stipulated facts of the Plea Agreement, the defendant agreed to launder the fraudulent proceeds from his co-

conspirators' scheme to defraud a nonprofit hospital system of millions of dollars. *See* Plea Agreement [doc. #15], at 10–14. Co-conspirators David Rietz and Richard Scott Cartwright (charged in case number 18-cr-479-RBJ) together executed the scheme to defraud, causing the hospital to pay Cartwright approximately $19 million in fraudulent proceeds on sham invoices for work on an IT project. Rietz, the hospital employee and "inside man" in charge of the IT project on the hospital side, was the architect of the scheme. Rietz was to get half of the fraudulent proceeds, but Cartwright had no way to get the money to Rietz. That is where the defendant here came in.

To effect the money laundering conspiracy, the defendant agreed with his friend and co-conspirator, Rietz, that Cartwright would make a sham "investment" in a shell company the defendant created for the sole purpose of laundering money. The defendant signed false documents identifying "projects" the company was working on and in which Cartwright purported to invest. The defendant falsely represented that Cartwright's investment bought him a certain number of shares in the fake company. The defendant then used the sham investment money to make payments from the fake company to Rietz, falsely identifying the transfers of funds as payments for items that did not exist and for services Rietz never provided to the defendant. *Id.* The defendant signed numerous false documents, including false "bills of sale," as part of the conspiracy. *Id.* The defendant also kept a cut of the fraudulent proceeds, approximately $1.4 million, for his own personal use.

Over a period of just six weeks, the defendant obtained and laundered approximately $7.6 million dollars. *See id.* at 12–14. The defendant transferred a significant portion of the funds directly to Rietz as "payments" for the nonexistent goods and services. But he also made

2

numerous payments at Rietz's direction and on his behalf, purchasing twelve cashier's checks totaling over $400,000 to pay Rietz's credit card bills and other debts. *Id.* at 12. The defendant also purchased $745,000 in gold coins for Rietz, keeping a portion of those coins for himself. *Id.* at 13–14. The defendant's plea to a conspiracy capped his exposure at five years for an otherwise very serious offense, and his cooperation earned him a variance from the already-reduced guideline range. Thus, his ultimate sentence of 36 months imprisonment was a significant discount from the sentence he could have otherwise faced based on the seriousness of his conduct.

The defendant began his term of imprisonment on December 31, 2019, and to date has served less than five months, just over ten percent, of his term of imprisonment.

**B.     Procedural History**

The Court denied the defendant's first motion for compassionate release [doc. # 59] based on the defendant's failure to comply with the jurisdictional exhaustion requirements. *See* Order [doc. #66]. The defendant filed his first motion on March 19, 2020, before he had submitted a request with the warden as required by statute. The defendant subsequently filed that request on March 22, 2020. *See* Supplement to Reply, Exhibit 1 [doc. #64-1]. The warden denied the defendant's request on April 28, 2020. *See* Renewed Motion, Exhibit 2 [doc. #67-2]. The instant motion was properly filed following expiration of the thirty-day period from the date of the defendant's request to the warden, and the Court has jurisdiction to rule on the motion.

The defendant's renewed motion relies on the same issues as the first—his mother's health and his own concerns regarding COVID-19. The day after the defendant's filing, a supplemental filing informed the Court that the defendant's mother had passed away. *See*

Supplement to Renewed Motion [doc. #69].  The only question raised by the defendant's motion, therefore, is whether the defendant should be released from the majority of his sentence based on his health concerns in light of the COVID-19 pandemic.

**C.      BOP's Response to the COVID-19 Pandemic**

At the time of this filing, the Bureau of Prisons ("BOP") has not reported any inmates with COVID-19 at FCI-Englewood, where the defendant is incarcerated.  *See* https://bop.gov/coronavirus (last visited May 26, 2020).  The facility reported one infected staff member, and that individual is noted as recovered.  *Id.*  In contrast, Jefferson County, where the defendant's residence is located (*see* Presentence Investigation Report [doc. #29]), and where the defendant wishes to be released, has reported 2,061 cases and 146 deaths.  *See* Colorado Department of Public Health and Environment, COVID-19 Data, *available at* https://covid19.colorado.gov/covid-19-data (last visited May 26, 2020).  The contrast in these numbers is a testament to the professional and comprehensive efforts of trained professionals at the BOP, who have instituted strict protocols to protect both staff and inmates.  It is also a clear indication of the efficacy of the BOP's procedures.

From the beginning of this pandemic, BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), *available at* https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited May 26, 2020). Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.  BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), *available at* https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited May 26,

2020). That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plans, to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis. The current status of the BOP's operations plan is summarized on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp. As of the time of filing, the BOP reports that their comprehensive plan to protect inmates includes the following measures: continued suspension of social visits, restricted inmate movement, limitations on legal visits and screening measures for allowed visits, suspension of official staff travel, suspension of staff training, limitations on contractual providers of essential services, suspension of volunteer visits, enhanced health screening for staff, and enhanced screening of inmates with quarantine for asymptomatic inmates with exposure risk factors and for symptomatic inmates. *See* http://www.bop.gov/coronavirus/index.jsp (last visited May 26, 2020).

## II.  Argument

**A.  The Defendant Fails to Meet His Burden to Justify Compassionate Release**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment.  If the exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i).  As directed by Congress in 28 U.S.C. § 994(t), the Sentencing Commission's policy statements define "extraordinary and compelling reasons" in U.S.S.G. § 1B1.13, "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)."  As the movant, the defendant bears the burden to establish that the Court should release him from his sentence early. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014); *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (unpublished).  As the terminology in the statute makes clear, compassionate early release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (unpublished) (citations omitted).

The defendant asserts that he has a number of medical issues that would make him vulnerable to a potential future outbreak of COVID-19 in his facility.  A review of the defendant's medical records from the Bureau of Prisons confirms that he is diagnosed with and medicated for type 2 diabetes, a condition from which he is not expected to recover. *See* Exhibit

1 hereto (BOP medical records).[1] The Centers for Disease Control ("CDC") identifies type 2 diabetes as a risk factor for an individual who develops COVID-19.[2] As noted, the Policy Statements of the Sentencing Commission define the factors that constitute extraordinary and compelling reasons. One such factor is "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, comment. (n.1(A)(ii)(I)). Based on evolving guidance and directives from the Department of Justice, the United States concedes that the defendant's diabetes diagnosis fulfills this guideline policy statement—the defendant is an inmate who presents one of the CDC risk factors as confirmed by his BOP medical records, and he is not expected to recover from that

---

[1] Because this exhibit contains the defendant's personal medical information, the exhibit is separately filed with a motion to restrict the exhibit at Level 2.

[2] The CDC risk factors are listed at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 22, 2020). The defendant asserts that he has suffered from other medical conditions in addition to type 2 diabetes that would put him at risk should he be infected with COVID-19, specifically hypertension, achalasia, asthma, and obesity. *See* Motion [doc. # 67] at 4–5. Achalasia is not a CDC risk factor, and only *pulmonary* hypertension (which affects the lungs) is a risk factor, whereas the defendant has been diagnosed with essential (primary) hypertension. *See* Exhibit 1 at p.2 (listing defendant's conditions as of April 28, 2020, as essential (primary) hypertension, gastro-esophageal reflux disease, osteoarthritis of knee, and type 2 diabetes mellitus). Only moderate and severe asthma are CDC risk factors, and there is no indication of a diagnosis of asthma or asthma concerns in the defendant's BOP medical files. Finally, with respect to obesity, the defendant's primary care physician stated that the defendant's BMI is 46 "[a]t the last visit in our office" [doc. #67-3], which date is not specified but is necessarily before the defendant reported to prison in December 2019. While BMI is not reported in the BOP medical files, the most recent records indicate that the defendant had been losing weight at the rate of two pounds per week, and notes from a January 13, 2020, exam indicate, "Obese: No." *Id.* at pp. 1, 32. The government's review of the defendant's file did not locate information that the defendant's type 2 diabetes or other "chronic conditions" were not "well-controlled," or that he was being denied any medication, as the defendant suggests in his motion [doc. #67 at 4–5].

7

condition. Therefore, the United States concedes that the defendant has presented an "extraordinary and compelling reason" under 18 U.S.C. § 3582 and the guidelines for the Court to consider compassionate release.

Of course, the fact that the defendant has established an extraordinary and compelling reason does not entitle him to a reduction in sentence. The defendant must also demonstrate that the section 3553(a) sentencing factors weigh in favor of his release. Again, it is the defendant's burden to demonstrate that the brief period of his sentence that he has served to date—five months of his thirty-six month sentence—fulfills the sentencing objectives of those section 3553(a) factors the Court relied upon in sentencing him for his role in laundering significant fraud proceeds. Here, early release undermines the objectives of the sentencing factors, and the defendant's motion should be denied for that reason.

The defendant played a critical role in his co-conspirators' fraudulent scheme by laundering nearly $8 million in fraudulent proceeds through his fake company in just six weeks. The defendant knew that those millions of dollars he was laundering were just *half* of the total fraud proceeds. Based on these dollar figures and the timeframe alone, there is no question that the defendant knew he was involving himself in a very serious crime. Nevertheless, he knowingly and intentionally agreed to take an active role in concealing the fraud proceeds, impeding the victim's ability to discover the crime and to recover its losses. The defendant created and signed multiple false documents, representing that the fake company he made up just to launder funds was financially involved in numerous projects in which Cartwright purported to invest. The defendant then took the money he knew to be illegally obtained and passed it on to Rietz, again creating false documents to make it look like the defendant's fake company was

buying goods and services from Rietz. Of course, there were no such goods or services, despite the numerous "bills of sale" and contracts the defendant signed to make it look like there were. No less than twelve times, the defendant obtained cashier's checks from the fraudulent proceeds and used them to pay debts in Rietz's name. He bought a load of gold coins using over $700,000 of ill-gotten gains, and kept a portion for himself. In total, the defendant kept approximately $1.4 million of a non-profit hospital's money for himself.

In sum, the defendant committed a deliberate crime, and the sentence the Court issued reflected the seriousness of the offense and the need to promote respect for the law in the face of the knowing, repeated, and flagrant violations. In the case of such a serious offense, the need for deterrence is also paramount. Lenient sentences for white collar offenders can only encourage crime—the risk is worth the potential reward to the criminal when the consequences are not severe. The defendant's variant thirty-six month sentence in the face of his serious crime was a result of his cooperation with the government. To further discount his sentence to time served would unjustifiably erode the important sentencing objectives that animated the Court's sentence. A sentence of five months is insufficient to represent the seriousness of the offense, promote respect for the law, and provide deterrence. 18 U.S.C. § 3553(a)(2). *See, e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D. N.M. 2019) (concluding statutory sentencing factors outweighed finding of extraordinary and compelling reason based on defendant's medical condition; defendant had served only five months of twenty-four month sentence on wire fraud charge for which he had received variant sentence).

### B.       The BOP Retains Authority to Release the Defendant Should Circumstances Justify

One final consideration counsels against a sentence reduction, and that is the BOP's ability to exercise its expert agency authority to release the defendant to home confinement should his individual circumstances and those of his prison facility so justify. As the Court noted in its order denying the defendant's first motion, the BOP has authority to release inmates to home confinement. *See* Order [doc. # 66] at 4 n.2. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement under 18 U.S.C. § 3624(c)(2). Congress acted to enhance BOP's flexibility to respond to the pandemic by lengthening the statutory amount of time for which an inmate can be placed on home confinement, thereby broadening the population of eligible inmates for such release. *See* Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion. In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. *See* BOP, COVID-19 Home Confinement Information, *available at* https://www.bop.gov/coronavirus (last visited May 26, 2020) (reporting that, since issuance of the Attorney General's memorandum, the BOP has placed an additional 3,174 inmates on home confinement; an increase of 111 percent).

The defendant has requested the BOP assign him to home confinement. As of this filing, the defendant's request remains pending with the warden of his facility. That option would present a far more narrowly tailored alternative to address the potential COVID-19 threat than

reducing the defendant's duly imposed criminal sentence. The BOP is constantly monitoring the status of its facilities and its inmates. FCI Englewood is familiar with the details of the defendant's medical history and his current medical status. And as outlined above, BOP is taking significant precautions to ensure that its inmates remain safe and its facilities are protected from a COVID-19 outbreak. If BOP ultimately concludes that home confinement is inappropriate, that decision would reflect BOP's expert judgment that it is not in the public interest to release the defendant at this time in light of his individual circumstances and those present at his facility.

### III.   Conclusion

For the foregoing reasons, the defendant has failed to meet his burden to justify compassionate release, and the United States respectfully submits that the Court should deny the defendant's motion.

Respectfully submitted this 26th day of May, 2020.

JASON R. DUNN
United States Attorney

By: */s/ Anna K. Edgar*
Anna K. Edgar
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0409
E-mail: Anna.Edgar@usdoj.gov
Attorney for the United States

11

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 26th day of May, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

      By: */s/ Amy McDaniel*
      Amy McDaniel
      Legal Assistant